JAMES M. BARRETT et al., Individually and as Parents and Natural Guardians of JAMES M. BARRETT, JR., Also Known as SHAMUS BARRETT, an Infant, Respondents, v ARNOLD N. LUBIN, as Commissioner of Health of the County of Erie, et al., Appellants.

Fourth Department, February 5, 1993

APPEARANCES OF COUNSEL

*Patrick H. Nemoyer,* Buffalo *(Alan Gerstman* of counsel), for appellants.

*Burgio, Kita & Curvin,* Buffalo *(Steven Curvin* of counsel), for respondents.

## OPINION OF THE COURT

BOEHM, J.

The question raised by this appeal is whether the interpretation and application of Public Health Law § 2581 (2) by respondent Commissioner of Health Arnold N. Lubin (Lubin) was arbitrary, capricious and erroneous as a matter of law.

## I

Petitioners James and Barbara Barrett are the parents of James (Shamus) Barrett, Jr., born on March 4, 1977. On July 10, 1986, Shamus was grievously injured in an accident while a passenger in an automobile operated by his mother. He was taken to Children's Hospital in Buffalo, where he remained in a coma for approximately six to eight weeks. Upon emerging from the coma, Shamus' ability to understand was severely impaired, and he could communicate only by blinking his eyes. After 4½ months at Children's Hospital, Shamus was moved to a rehabilitation center in Pittsburgh, Pennsylvania. At the rehabilitation center, Shamus' condition marginally improved; he learned to grasp with his left hand, he was able to straighten out of a fetal position and his naso-gastric tube was removed.

Shamus' rehabilitation was limited because of his massive brain injury. At the time of his discharge from the rehabilitation center and his return to Buffalo, Shamus weighed only 72 pounds. He is at present a spastic quadriplegic, without the ability to speak. He must use a touch talker to communicate. He cannot feed himself or take care of his personal hygiene. During the night, he wets the bed and must be moved periodically to avoid bed sores. He sleeps only two to four hours at a time, occasionally awakening with nightmares. In addition, Shamus' physicians have prescribed serial casting to reduce his normally flexed position. He cannot operate a manual wheelchair but is able to operate a power chair with his left hand.

Mr. and Mrs. Barrett, Shamus and his sister, Meghan, live in a single-family, three-story home in Buffalo. The house has two bedrooms and a full bath on the third floor and three bedrooms and a full bath on the second floor. The first floor consists of a living room, dining room, kitchen, family room, small office and a half bathroom, described by a social worker as "small" and "inaccessible". Shamus' bedroom is on the second floor, directly across from his parents' bedroom. A single, two-flight stairway is the only means of getting from the first to the second floor. Shamus must be carried from one floor to the other, which becomes increasingly difficult as he grows older. He is now 15. Because Mr. Barrett's job frequently takes him out of town, it is necessary at those times for Mrs. Barrett, with Meghan's help, to carry Shamus upstairs, and Mrs. Barrett has developed chronic back strain from doing so.

In December 1989, respondent County of Erie (County) accepted Shamus into the Physically Handicapped Children's Program (Program) (see, Public Health Law §§ 2580-2584; 10 NYCRR part 46). Within the guidelines of the Program, the County is obligated to pay for medical services, which are defined as "such diagnostic, therapeutic, and rehabilitative care by medical and paramedical personnel, including hospital and related care, and drugs, prostheses, appliances, equipment and devices as necessary" (Public Health Law § 2581 [2]; see also, 10 NYCRR 46.1).

In late 1989, Lila Diederich, Shamus' caseworker, visited the Barrett home and recommended that an elevator be installed. In June 1990, Shamus' physician prescribed installation of an elevator for both therapeutic and rehabilitative purposes. On Diederich's advice, the Barretts retained the Independent Living Center to evaluate what improvements to their home were necessary to make it more accessible for Shamus. The Independent Living Center developed three options, each of which involved the installation of an elevator, and construction bids for the project were procured by the Barretts. Two other options presented to the Barretts were deemed unacceptable. A stairglide was structurally impossible because the stairway landing on the second floor was too narrow. Further, Shamus would be unable to transfer in and out of the stairglide under his own power. Conversion of the family room into a bedroom for Shamus was rejected by the Barretts as too costly. In the opinion of Shamus' physicians, conversion of the family room was inappropriate for a variety

of reasons: the distance between the family room on the first floor and the bedroom of Mr. and Mrs. Barrett on the second floor, Shamus' need for periodic attention during the night, and the impairment of Shamus' cognitive abilities as well as his inability to communicate verbally in the event he needed help.

The Barretts applied to the Program for payment of the expense of installing the elevator in their home. Upon receipt of their request, Diederich, after making an evaluation of the Barretts' home, recommended that the request be denied and that the Barretts renovate their home to create a first-floor bedroom for Shamus. On February 22, 1991, the Program's medical director formally denied the Barretts' request for an elevator, writing that "such equipment does not fit into the scope of our program".

On March 4, 1991, the Barretts asked Lubin to reconsider their request, noting that home elevators had previously been approved for two other people, at least one of whom was less disabled than Shamus. Three of Shamus' physicians wrote to Lubin urging that the request be granted because the elevator was a medical necessity. On April 22, 1991, Lubin upheld the denial of the Barretts' request, giving as his reasons that he was not authorized to grant payment for an elevator under Public Health Law § 2581 (2) and that, even if he were authorized to do so, the Barretts had failed to establish that an elevator was a medical necessity.

The Barretts then commenced this CPLR article 78 proceeding, and respondents moved for summary judgment. Supreme Court held that a home elevator came within the definition of "appliances, equipment and devices" referred to in Public Health Law § 2581 (2) and ordered a hearing to determine whether the elevator was necessary for Shamus' "therapeutic and rehabilitative care". At the hearing, it was conceded by the Program's medical director that Shamus was medically and financially eligible for financial assistance under the Program, that an elevator can serve a rehabilitative purpose, that he had previously authorized payment for two home elevators, and that he had previously authorized payment for stairlifts and for wooden and concrete ramps, as well. It was acknowledged by Lubin that Shamus' Program file supported the recommendation for an elevator as both rehabilitative and therapeutic and that such was his opinion also. He also admitted that stairglides serve the same purpose as an elevator. At the conclusion of the hearing, Supreme Court held that

Lubin's decision was arbitrary and capricious and ordered respondents to pay for the installation of an elevator in the Barrett home.

## II

On appeal, respondents contend that Lubin's determination that an elevator did not fall within the statutory definition of medical services because it is a permanent addition to real property that cannot be removed and used elsewhere, such as a wheelchair or prosthetic device, was not arbitrary or irrational. "It is well settled that an agency's interpretation of the statutes it administers must be upheld absent demonstrated irrationality or unreasonableness *(see, Matter of Lezette v Board of Educ.,* 35 NY2d 272, 281; *Matter of Howard v Wyman,* 28 NY2d 434, 438, *rearg denied* 29 NY2d 749; *Matter of Flowers v Perales,* 140 AD2d 136, 142-143; McKinney's Cons Laws of NY, Book 1, Statutes § 129)" *(Matter of Buffalo Columbus Hosp. v Axelrod,* 165 AD2d 605, 607). Lubin's rationale for denying payment, however, does not satisfy that test.

The meaning of Public Health Law § 2581 (2), and specifically the meaning of "appliances, equipment and devices", is not clear on its face. Hence, extrinsic evidence and the rules of construction may be looked to in resolving the question whether an elevator, unquestionably a permanent addition to real property, is such an appliance, equipment or a device *(see, Matter of Buffalo Columbus Hosp. v Axelrod, supra,* at 607; *Civil Serv. Empls. Assn. v County of Oneida,* 78 AD2d 1004, 1004-1005, *lv denied* 53 NY2d 603). In interpreting a statute, an agency's application of the statute is entitled to great weight *(see,* McKinney's Cons Laws of NY, Book 1, Statutes § 129; *see also, Bullock v Cooley,* 225 NY 566, 571; *Matter of Buffalo Columbus Hosp. v Axelrod, supra,* at 608). The record shows that, on two prior occasions, payment for home elevators by the Program had been authorized by the County. In addition, respondents routinely approved payment for ramps and stairlifts, which, like elevators, are permanent improvements to real property. In the context of respondents' past practices, Lubin's determination that an elevator is not a medical service within the meaning of Public Health Law § 2581 (2) because it is a permanent addition to real property is irrational and unreasonable.

## III

Moreover, the fact that elevators had been twice approved

in the past when shown to be medically necessary compels the conclusion that respondents acted arbitrarily in denying the Barretts' request for an elevator. Respondents concede that the two prior requests were granted but contend that Lubin should not be bound by those prior approvals because he was not personally involved with them.

Although courts will give deference to an administrative agency's interpretations of the statutes and regulations that it administers, courts are not exponents "of what Max Weber once referred to as 'Khadi justice', in which the great caliph would sit on his cushion and decide each case intuitively, without regard to precedents or reasoned elaboration of law" (Kaufman, *Judicial Review of Agency Action: A Judge's Unburdening,* 45 NYU L Rev 201, 208-209 [1970]). Procedural due process and fundamental fairness, even in cases involving administrative agencies, require that like cases be treated alike *(see, Matter of Italian Sons & Daughters v Common Council,* 89 AD2d 822, 823). Judicial review of agency decisions properly preserves the essentials of due process by restraining arbitrary exercises of administrative discretion *(see, Matter of Buffalo Columbus Hosp. v Axelrod, supra).* "[W]hen an agency determines to alter its prior stated course it must set forth its reasons for doing so. Unless such an explanation is furnished, a reviewing court will be unable to determine whether the agency has changed its prior interpretation of the law for valid reasons, or has simply overlooked or ignored its prior decision (Kramer, *[Place and Function of Judicial Review in the Administrative Process,* 28 Fordham L Rev 1], at 68-70). Absent such an explanation, failure to conform to agency precedent will, therefore, require reversal on the law as arbitrary, even though there is in the record substantial evidence to support the determination made [citations omitted]." *(Matter of Field Delivery Serv. [Roberts],* 66 NY2d 516, 520.)

Lubin's argument that he had not given prior approvals for the home elevators previously installed does not constitute a sufficient explanation for his determination that a medically necessary home elevator would no longer be paid for by the Program. That determination was contrary to the Program's precedents and was without reasoned elaboration. His contention that he had not personally reviewed the applications for the installation of elevators is dubious in light of the fact that the prior approvals could not have been made without his

personal approval *(see,* Public Health Law § 2582). According to petitioners, previously approved applications had to be certified by Lubin because the State bears one half of the cost. Moreover, Lubin's conclusion that an elevator installation would be more costly than the renovation of the family room is unsupported by the record. Lubin conducted no independent inquiry into the relative costs of the available options, and the only proof presented was by petitioners. That proof showed that an elevator would be a cost-effective choice.

## IV

Accordingly, respondents' determination was arbitrary and capricious, and the judgment should be affirmed.

CALLAHAN, J. P., BOOMER, GREEN and DAVIS, JJ., concur.

Judgment unanimously affirmed, with costs.